## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| **MID-ATLANTIC FIELD SERVICES LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** ___3:23CV177___ |
| | ) | |
| **BOBBIE BARFIELD,** | ) | |
| | ) | |
| | ) | |
| **BRANDI NICOLE GWINN** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **HYDRO MOLE, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Mid Atlantic Field Services LLC ("Mid-Atlantic"), by counsel, for its Complaint against Defendants Bobbie Barfield ("Barfield"), Brandi Nicole Gwinn ("Gwinn"), and Hydro Mole, LLC ("Hydro Mole"), (collectively, "Defendants"), alleges on personal knowledge, information and belief as follows:

## PARTIES

1.     Mid-Atlantic is a Virginia limited liability company with its principal office in Chesterfield, Virginia.  Mid-Atlantic is engaged in the business of industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services.

2.     Barfield is a former employee of Mid-Atlantic and a resident of Dewitt or North Dinwiddie, Virginia.  Barfield is the boyfriend of Gwinn.  Barfield currently works for or on behalf of Hydro Mole, a direct competitor of Mid-Atlantic engaged in the same business.

3. Gwinn is a resident of North Dinwiddie, Virginia. Gwinn is the girlfriend of Barfield. Gwinn is a Member or Manager and the Registered Agent of and currently works for or on behalf of Hydro Mole, a direct competitor of Mid-Atlantic engaged in the same business.

4. Hydro Mole is a Virginia limited liability company with its principal office in North Dinwiddie, Virginia. Barfield and Gwinn formed Hydro Mole and appointed Gwinn as the Registered Agent of Hydro Mole on September 19, 2022. Hydro Mole is a direct competitor of Mid-Atlantic engaged in the business of industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services. Hydro Mole's principal office is located within eighteen (18) miles of Mid-Atlantic's principal office.

## JURISDICTION AND VENUE

5. This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because claims at issue are governed by the laws of the United States, specifically the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. ("DTSA").

6. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over other claims brought by Mid-Atlantic because they form part of and arise out of the same case or controversy as the claims over which this Court has original subject matter jurisdiction.

7. This Court has personal jurisdiction over Defendants because Barfield and Gwinn reside in Virginia, Hydro Mole was formed and has its principal office in Virginia, and Defendants regularly transact business in Virginia.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Mid-Atlantic's claims occurred in Chesterfield, Virginia.

9. Venue also is proper in this Court pursuant to the mandatory and exclusive forum selection clause in Section 11 of Barfield's Employment Agreement with Mid-Atlantic.

**NATURE OF THE ACTION**

10.    This action arises out of:  (a) Defendants' misappropriation of Mid-Atlantic Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. ("DTSA") (Count 1); (b) Defendants' misappropriation of Mid-Atlantic Trade Secrets under the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, et seq. ("VUTSA") (Count 2); (c) Barfield's breach of his Employment Agreement with Mid-Atlantic (Count 3); (d) Barfield's breach of his fiduciary duties to Mid-Atlantic (Count 4); (e) Gwinn's and Hydro Mole's tortious interference with Barfield's Employment Agreement (Count 5); (f) Gwinn's and Hydro Mole's aiding and abetting Barfield's breaches of his fiduciary duties (Count 6); (g) Defendants' conversion (Count 7); (h) Defendants' unjust enrichment (Count 8); (i) Defendants' tortious interference with Mid-Atlantic's customer relationships (Count 9); and (j) Defendants' business conspiracy to harm Mid-Atlantic in its business, trade and reputation under Va. Code §§ 18.2-499-500 (Count 10).

11.    Mid-Atlantic seeks preliminary and permanent injunctive relief and monetary damages from Defendants to prevent and compensate for actual and threatened injury to Mid-Atlantic in its business, trade and reputation arising from Defendants' trade secret misappropriation (Counts 1-2), breach of contract (Count 3), breach of fiduciary duties (Count 4), tortious interference with contract (Count 5), aiding and abetting (Count 6), conversion (Count 7), unjust enrichment (Count 8), tortious interference with customer relationships (Count 9), and business conspiracy (Count 10).

12.    In addition to preliminary and permanent injunctive relief and compensatory damages (Counts 1-10), Mid-Atlantic also seeks from Defendants punitive damages (Counts 1-2, 4-7 & 9-10), disgorgement of wrongful gains (Counts 1-2, 4 & 8), treble damages (Count 10), and recovery of attorneys' fees, costs and expenses (Counts 1-3 & 10).

## FACTUAL ALLEGATIONS

### Mid-Atlantic Trade Secrets

13.     Mid-Atlantic, through extensive effort and expenditure of considerable amounts of time and money, has developed commercially valuable trade secrets relating to its industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services, including customer lists, files and records, customer quotes, pricing and contracts, customer preferences and requirements, cost, pricing and profit information, pricing strategies for existing, pending and prospective projects, contracts and orders, detailed actual and forecasted financial information, profit margin information, and other confidential and proprietary information which would cause competitive harm to Mid-Atlantic if misappropriated, used or disclosed by others ("Mid-Atlantic Trade Secrets").

14.     These Mid-Atlantic Trade Secrets are a valuable commercial asset of Mid-Atlantic, and Mid-Atlantic has guarded the secrecy of these Mid-Atlantic Trade Secrets from disclosure to competitors or other persons and entities outside of Mid-Atlantic.  Mid-Atlantic derives independent economic value from these Mid-Atlantic Trade Secrets not being generally known or readily ascertainable by other persons or entities.

15.     These Mid-Atlantic Trade Secrets constitute trade secrets under the DTSA and the VUTSA.

16.     At all times, Mid-Atlantic has engaged in reasonable efforts to maintain the secrecy of these Mid-Atlantic Trade Secrets.  Mid-Atlantic Trade Secrets are only provided to Mid-Atlantic employees on a need-to-know basis subject to password protection and are not provided to anyone outside of the organization without a specific need and appropriate confidentiality and non-disclosure restrictions.

4

17.     Among other things, Mid-Atlantic has implemented, and its employees have agreed to policies and procedures that prohibit disclosure of Mid-Atlantic Trade Secrets.

18.     To protect these Mid-Atlantic Trade Secrets, Mid-Atlantic also requires its employees, including Barfield, to agree to maintain the confidentiality and refrain from improperly using or disclosing Mid-Atlantic Trade Secrets, pursuant to their employment agreements with Mid-Atlantic.

### Mid-Atlantic Hires and Employs Barfield

19.     On July 2, 2020, Mid-Atlantic hired and employed Barfield as Sales and Operations Manager.

20.     As  Sales and Operations Manager of Mid-Atlantic, Barfield was responsible for, among other things, quoting, pricing, servicing and contracting with Mid-Atlantic's customers and marketing, offering and providing industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services.

### Barfield Enters into his Employment Agreement

21.     On April 4, 2022, Barfield and Mid-Atlantic executed and entered into the Employment Agreement attached hereto as **Exhibit 1** (the "Employment Agreement").

22.     Pursuant to Section 1 of his Employment Agreement, Barfield agreed to devote his best efforts and use due diligence in performing duties for and promoting the business of Mid-Atlantic, and to act in accordance with and obey all ethical mandates, statutes, rules and regulations.

23.     Pursuant to Section 6 of his Employment Agreement, Barfield agreed not to misappropriate or improperly use or disclose any Mid-Atlantic Trade Secrets or other Mid-Atlantic confidential or proprietary information during and after his employment with Mid-

{#2000647-1, 116910-00000-01}

Atlantic, and to deliver to Mid-Atlantic all Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential or proprietary information upon termination of his employment.

24.     Pursuant to Section 7(a) of his Employment Agreement, Barfield agreed, for twelve (12) months following the end of his employment with Mid-Atlantic, not to engage in a Competitive Position within a fifty (50) mile radius of Mid-Atlantic's principal office in Chesterfield, Virginia

25.     Pursuant to Section 7(b) of his Employment Agreement, Barfield agreed, for twelve (12) months following the end of his employment with Mid-Atlantic, not to solicit, contact, communicate or meet with any Mid-Atlantic customers for competitive business purposes.

26.     Pursuant to Section 7(c) of his Employment Agreement, Barfield agreed, for twelve (12) months following the end of his employment with Mid-Atlantic, not to solicit, recruit or hire any Mid-Atlantic employees or induce any Mid-Atlantic employees to terminate their employment with Mid-Atlantic.

27.     Pursuant to Section 8(a) of his Employment Agreement, Barfield agreed that the covenants and restrictions in Section 6 and 7 of his Employment Agreement are reasonable and necessary for the protection of Mid-Atlantic's business interests, and in the event Barfield breaches any of these provisions, Mid-Atlantic will be entitled not only to monetary damages, but also injunctive relief and reimbursement of its attorneys' fees, costs and expenses.

28.     Pursuant to Section 8(b) of his Employment Agreement, Barfield agreed that the duration of the covenants and restrictions in Section 6 and 7 of his Employment Agreement shall be extended and tolled during the pendency of any violations, and these covenants and restrictions shall run from the date of entry of the injunction order forward.

{#2000647-1, 116910-00000-01}

**Barfield is Entrusted with Mid-Atlantic Trade Secrets**

29.     As Sales and Operations Manager of Mid-Atlantic, Barfield was responsible for, among other things, negotiating and generating quotes, pricing and contracts for and servicing Mid-Atlantic's customers, marketing, offering and providing industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services, and growing and expanding Mid-Atlantic's business.

30.     Over the course of his employment with Mid-Atlantic, Mid-Atlantic trained Barfield and disclosed Mid-Atlantic Trade Secrets to Barfield and entrusted Barfield with these Mid-Atlantic Trade Secrets.  Barfield understood and agreed pursuant to Sections 6 and 8(a) of his Employment Agreement that the misuse or disclosure of these Mid-Atlantic Trade Secrets or any other Mid-Atlantic confidential or proprietary information would be detrimental to Mid-Atlantic and that Mid-Atlantic would suffer great loss and damage if Barfield should, on his own behalf or on behalf of any other person or entity, misuse or disclose any of these Mid-Atlantic Trade Secrets or any other Mid-Atlantic confidential or proprietary information.

31.     Among the Mid-Atlantic Trade Secrets that Mid-Atlantic disclosed to Barfield was Mid-Atlantic's customer lists, files and records, customer quotes, pricing and contracts, customer preferences and requirements, cost, pricing and profit information, pricing strategies for existing, pending and prospective projects, contracts and orders, detailed actual and forecasted financial information, and profit margin information.

32.     Over the course of his employment with Mid-Atlantic, Barfield had frequent contact, communications and dealings with Mid-Atlantic's customers.  Barfield negotiated and generated quotes, pricing and contracts for and serviced Mid-Atlantic's customers, and marketed, offered and provided industrial vacuuming and cleaning services, municipality vacuuming and

cleaning services, and hydro excavation services.  He also negotiated both pricing and job requirements for subcontractors on behalf of Mid-Atlantic.

**Defendants Launch Their Plan to Steal Mid-Atlantic's Business**

33.    On September 19, 2022, Barfield and Gwinn formed Hydro Mole and appointed Gwinn as the Registered Agent of Hydro Mole.

34.    Barfield represented to and assured Mid-Atlantic's Business Manager Craig Stariha ("Stariha") that Hydro Mole would not compete with Mid-Atlantic or solicit its customers or employees and would instead provide services that differed from and were not competitive with the industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services that Mid-Atlantic provided.

35.    Barfield further represented to and assured Stariha and Mid-Atlantic that Defendants would honor and not interfere with his Employment Agreement.

36.    Barfield further represented to and assured Stariha and Mid-Atlantic that Hydro Mole would only engage in non-competitive activities.  Specifically, Barfield represented to and assured Stariha thar Hydro Mole would not engage in any industrial vacuuming and cleaning services or municipality vacuuming and cleaning services, and to the extent Defendants engaged in any hydro excavation services it would only be as a subcontractor for Mid-Atlantic on Mid-Atlantic projects and not in any other capacity.

37.    Consistent with his representations and assurances to Stariha and Mid-Atlantic, Barfield contacted Stariha and purported to express interest in Hydro Mole buying certain Mid-Atlantic personal property (the Mid-Atlantic Personal Property") and receiving an assignment of the lease for Mid-Atlantic's facility located at 1501 W Washington St, Petersburg, Virginia 23803 (the "Mid-Atlantic Petersburg Facility").

{#2000647-1, 116910-00000-01}

38.     Consistent with his representations and assurances to Stariha and Mid-Atlantic, Barfield purported to negotiate with Stariha an Asset Purchase Agreement for the Mid-Atlantic Personal Property that would include an assignment of the lease for the Mid-Atlantic Petersburg Facility, and close by March 1, 2023.

39.     Barfield represented to and assured Stariha and Mid-Atlantic that Defendants intended to buy the Mid-Atlantic Personal Property, receive an assignment of the lease for the Mid-Atlantic Petersburg Facility, and close this transaction by March 1, 2023.

40.     In reasonable reliance on Barfield's representations and assurances and knowing that Barfield was prohibited from competing with Mid-Atlantic or soliciting its customers or employees pursuant to his Employment Agreement and applicable law, Stariha and Mid-Atlantic negotiated the purported transaction with Barfield in good faith.

41.     In reasonable reliance on Barfield's representations and assurances and knowing that Barfield was prohibited from competing with Mid-Atlantic or soliciting its customers or employees pursuant to his Employment Agreement and applicable law, Stariha and Mid-Atlantic agreed to allow Hydro Mole to use a small portion of the Mid-Atlantic Petersburg Facility to conduct its purportedly non-competitive business and provide hydro excavation services as a subcontractor for Mid-Atlantic on Mid-Atlantic projects until the transaction closed by March 1, 2023.

42.     Unbeknownst to Stariha and Mid-Atlantic, their trust in Defendants was misplaced.

43.     Unbeknownst to Stariha and Mid-Atlantic, Defendants had no intention of honoring their representations and assurances or complying with the Employment Agreement. And while Defendants may have had an intention to sign transaction documents, they had no

9

intention of actually paying for the Mid-Atlantic Personal Property. Instead, Defendants were engaging in a ruse, feigning interest in purchasing Mid-Atlantic's business, and effectively sneaking the fox into the hen house.

44.  Unbeknownst to Stariha and Mid-Atlantic, this was a set up to steal Mid-Atlantic's business without paying for it.

45.  Contrary to their representations and assurances, the Employment Agreement and applicable law, Defendants have (a) unlawfully competed with Mid-Atlantic, (b) solicited Mid-Atlantic's customers and employees, and (c) improperly used and disclosed Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential and proprietary information for their own benefit to compete with Mid-Atlantic and divert Mid-Atlantic's business, customers and employees to Hydro Mole in violation of the DTSA, the VUTSA, the Employment Agreement, Barfield's fiduciary duties and other applicable laws.

46.  Instead of (a) refraining from competing with Mid-Atlantic or soliciting its customers or employees and honoring the Employment Agreement as they promised or (b) buying the Mid-Atlantic Personal Property and leasing the Mid-Atlantic Petersburg Facility as they purportedly intended when they initiated and engaged in their ruse negotiations with Stariha and Mid-Atlantic, Defendants implemented their plan to steal Mid-Atlantic's business.

**Barfield Competitively Works for Hydro Mole While Still Employed with Mid-Atlantic**

47.  As part of Defendants' plan to steal Mid-Atlantic's business, Barfield began competitively working for Hydro Mole and soliciting Mid-Atlantic's customers and employees while still employed with Mid-Atlantic.

48.  Specifically, while still employed with Mid-Atlantic, Barfield on behalf of Defendants offered and provided competitive industrial vacuuming and cleaning services,

10

municipality vacuuming and cleaning services, and hydro excavation services, and solicited Mid-Atlantic's customers and employees.

49.     Refusing to wait until he resigned from Mid-Atlantic (much less the expiration of his 12 month non-compete and customer and employee non-solicitation), Barfield began competitively working for Hydro Mole and soliciting Mid-Atlantic's customers and employees on behalf of Hydro Mole while still employed with Mid-Atlantic, and Barfield did so with Gwinn's and Hydro Mole's full knowledge and assistance.

50.     During his employment with Mid-Atlantic, Barfield acted as a mole inside Mid-Atlantic and consulted, advised and assisted Hydro Mole and Gwinn in their efforts to compete with Mid-Atlantic. Defendants have conspired together to misappropriate Mid-Atlantic Trade Secrets, divert Mid-Atlantic's business, customers and employees to Hydro Mole, and engage in other unlawful activities.

**Barfield Resigns His Employment with Mid-Atlantic**

51.     On February 8, 2023, Barfield resigned his employment with Mid-Atlantic.

**Barfield Misappropriates Mid-Atlantic Trade Secrets and Destroys his Mid-Atlantic Computer to Unfairly Compete, Harm Mid-Atlantic, and Conceal the Conspiracy**

52.     Following his resignation on February 8, 2023, Barfield took and wrongfully retained possession of his company issued laptop computer that belonged to Mid-Atlantic (the "Mid-Atlantic Laptop")

53.     The Mid-Atlantic Laptop contained substantial Mid-Atlantic Trade Secrets, including quotes, pricing and contracts for Mid-Atlantic customers.

54.     Barfield negotiated and generated these quotes, pricing and contracts and serviced these Mid-Atlantic customers during his employment with Mid-Atlantic, he was a primary source of these Mid-Atlantic Trade Secrets, and he stored them on his Mid-Atlantic Laptop.

11

55.     On February 13, 2023 Barfield tricked Mid-Atlantic's IT contractor Tony Wesson of Wesson Technology ("Wesson") into:  (a) copying these Mid-Atlantic Trade Secrets from the Mid-Atlantic Laptop onto Barfield's personal laptop (the "Barfield Personal Laptop"); and (b) wiping and deleting all the contents of the Mid-Atlantic Laptop.

56.     In so doing, Barfield not only:  (a) wrongfully obtained these Mid-Atlantic Trade Secrets for Defendants to use in competition with Mid-Atlantic but also (b) completely wiped and deleted the Mid-Atlantic Laptop in an attempt to conceal Defendants' conspiracy and prevent Mid-Atlantic from accessing and using these Mid-Atlantic Trade Secrets which are essential to the operation of Mid-Atlantic's business.   Mid-Atlantic's ability to operate its business or service its customers is severely compromised without these critical customer quotes, pricing and contracts which Defendants misappropriated and destroyed.

57.     Barfield not only enabled Defendants' wrongful possession and use, but also denied Mid-Atlantic's rightful possession and use of these Mid-Atlantic Trade Secrets.

58.     Barfield did this for the specific purpose and intent of providing Hydro Mole an unfair competitive advantage, destroying Mid-Atlantic, and concealing his conspiracy.

**Barfield Breaches his Employment Agreement**

59.     During and after his employment with Mid-Atlantic, Barfield breached his obligations under his Employment Agreement by, among other things, failing to devote his best efforts and use due diligence in performing duties for and promoting the business of Mid-Atlantic, and failing to act in accordance with and obey all ethical mandates, statutes, rules and regulations in violation of Section 1, misappropriating and improperly using and disclosing Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential or proprietary information and failing to deliver to Mid-Atlantic all Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential and proprietary information in violation of Section 6, competing with Mid-Atlantic in violation of

12

Section 7(a), soliciting Mid-Atlantic customers in violation of Section 7(b), and soliciting Mid-Atlantic employees in violation of Section 7(c).

**Defendants Unlawfully Compete with Mid-Atlantic, Solicit Mid-Atlantic's Customers and Employees, and Misappropriate Mid-Atlantic Trade Secrets**

60.    Before and after Barfield left Mid-Atlantic's employment, Defendants not only diverted Mid-Atlantic's business, customers and employees to Hydro Mole but also further weakened Mid-Atlantic's ability to compete by sabotaging Mid-Atlantic's projects and customer and employee relationships and misappropriating Mid-Atlantic Trade Secrets.

61.    Although Mid-Atlantic's investigation is ongoing and Mid-Atlantic continues to uncover evidence of additional unlawful acts by Defendants, the following are a few examples of Defendants' unlawful actions uncovered to date (many of which were taken while Barfield was still by Mid-Atlantic).  These allegations do not serve as an exhaustive list of all of Defendants' unlawful actions, and Mid-Atlantic reserves the right to base its claims on other unlawful actions as discovery progresses.

62.    Over the past few weeks, numerous Mid-Atlantic customers and employees have come forward and advised Mid-Atlantic that Defendants have made false and defamatory statements about Mid-Atlantic and its business and have tried to mislead them into terminating their contracts and relationships with Mid-Atlantic and entering into contracts and relationships with Hydro Mole.

63.    Specifically, Defendants have falsely told Mid-Atlantic's customers and employees, among other things, that Mid-Atlantic has merged with Hydro Mole, that Defendants have bought and are taking over Mid-Atlantic's business, contracts and customer and employee relationships, and that Mid-Atlantic's employees are now working for Hydro Mole.  All of this is false and defamatory.

64.    Defendants also have attempted to bribe and coerce Mid-Atlantic's employees offering them cash payments of up to $150 not to show up at jobs in order to sully Mid-Atlantic's reputation and induce customers to terminate their relationships with Mid-Atlantic and transfer their business to Hydro Mole.

65.    In addition to defamation, bribery and coercion, Defendants have also used a variety of other unlawful means and methods to interfere with Mid-Atlantic's customer and supplier relationships, including misappropriating Mid-Atlantic Trade Secrets and using the misappropriated Mid-Atlantic Trade Secrets to contact customers, solicit and underbid projects, and steal Mid-Atlantic's business. On many occasions, Defendants with unlawful access to Mid-Atlantic's quotes, pricing, contracts and profit margins have solicited Mid-Atlantic customers and quoted, priced and contracted jobs at lower prices, causing Mid-Atlantic to suffer substantial losses. On other occasions, Defendants tried to sabotage Mid-Atlantic's projects by claiming Hydro Mole has purchased or now owns Mid-Atlantic or these projects. In all of these scenarios, Defendants' actions injured Mid-Atlantic. Examples abound:

(a)    On February 20, 2023, Barfield used his Mid-Atlantic email account to communicate with one of Mid-Atlantic customers to get Hydro Mole set up as the new supplier to the customer instead of Mid-Atlantic. A redacted copy of this email is attached as **Exhibit 2**.

(b)    On February 13, 2023, Barfield used his Mid-Atlantic email account to set up a meeting with an engineer at one of Mid-Atlantic's customers to provide him a quote for services that Mid-Atlantic performs for that customers. A redacted copy of this email is attached as **Exhibit 3**.

14

(c)      On January 20, 2023, Barfield used his Mid-Atlantic email account to forward Mid-Atlantic customer contact information to his Hydro Mole account.  A redacted copy of this email is attached as **Exhibit 4**.

(d)      On January 26, 2023, Barfield forwarded himself (from his Mid-Atlantic email account to his Hydro Mole account) information about a quote for power washing that he had provided to a Mid-Atlantic customer in November 2022.  A redacted copy of this email is attached as **Exhibit 5**.

(e)      On October 17, 2022, Barfield forwarded himself (from his Mid-Atlantic email account to his Hydro Mole account) all of Mid-Atlantic's proprietary new hire documents. A redacted copy of this email is attached as **Exhibit 6**.

(g).      On September 28, 2022, Barfield forwarded himself (from his Mid-Atlantic email account to his personal gmail account) the confidential rates of a subcontractor that Mid-Atlantic used to service customers.  A redacted copy of this email is attached as **Exhibit 7**.

(h)      On September 23, 2022, Barfield forwarded himself (from his Mid-Atlantic email to his personal gmail account) a hydro excavation quote.  While he received this quote on behalf of Mid-Atlantic, he used it to underbid on behalf of Hydro Mole, not acting as a Mid-Atlantic sub contractor, and thus cut Mid-Atlantic out of the entire project.  A redacted copy of this email is attached as **Exhibit 8**.

(i)      On March 7, 2023, Barfield's Mid-Atlantic email account received an email from a large Mid-Atlantic customer containing training material on how to invoice that customer.  Barfield was never involved in the invoicing process for Mid-Atlantic, so this would

15

only have been sent to him as part of his attempts to steal more business from Mid-Atlantic. A redacted copy of this email is attached as **Exhibit 9**.

(j)      On September 26, 2022, Mid-Atlantic entered into a Master Service Agreement with a significant customer. This agreement was signed by Craig Stariha on behalf of Mid-Atlantic. On October 21, 2022, Barfield signed a replacement Master Service Agreement, replacing Mid-Atlantic with Hydro Mole to perform the same services. Barfield signed on behalf of Hydro Mole and never informed Mid-Atlantic of his actions. Redacted copies of these agreements are attached as **Exhibit 10**.

66.      In addition to misappropriating Mid-Atlantic Trade Secrets, diverting Mid-Atlantic's business, customers and employees, soliciting and underbidding projects, and otherwise sabotaging Mid-Atlantic's projects and customer and employee relationships, Defendants have added insult to injury by disparaging and defaming Mid-Atlantic to customers and employees, and attempting to conceal and destroy any evidence that exposes their unlawful conduct or refutes their false narrative that they now own Mid-Atlantic and its business.

**Defendants Steal Mid-Atlantic's Vacuum Truck, Computer File and Other Property**

67.      In addition to misappropriating Mid-Atlantic Trade Secrets and destroying the contents of the Mid-Atlantic Laptop, Defendants stole from Mid-Atlantic a vacuum truck and property from the office and shop of Mid-Atlantic for improper and competitive purposes (the "Converted Mid-Atlantic Property").

68.      In November 2020, Mid-Atlantic bought and titled in its own name a vacuum truck for use in its business (the "Vacuum Truck").

69.      Mid-Atlantic purchased the Vacuum Truck for $52,053.47.

70.      The current market value of the Vacuum Truck is in excess of $50,000.

16

71.    Despite Mid-Atlantic's purchase and ownership of the Vacuum Truck, Barfield has possession of and refuses to return the Vacuum Truck to Mid-Atlantic.

72.    On or about February 12, 2023, Barfield entered Mid-Atlantic's business office after work hours without authorization or permission, and stole property from Mid-Atlantic's office and shop.  Barfield wrongfully accessed and searched Stariha's computer and deleted a computer file containing incriminating evidence that Stariha had complied against Defendants.

**Defendants Ignore Mid-Atlantic's Cease and Desist Letters**

73.    By letters dated February 16, 2023, Mid-Atlantic advised Defendants to cease and desist from further violations of the Employment Agreement or applicable law.

74.    Defendants have ignored Mid-Atlantic's request and continue to violate their contractual and legal obligations to Mid-Atlantic.

**Defendants' Actions Have Caused Great Harm to Mid-Atlantic's Business**

75.    Defendants have injured Mid-Atlantic by, among other things, misappropriating and exploiting Mid-Atlantic Trade Secrets to solicit and induce Mid-Atlantic's customers to terminate their relationships with Mid-Atlantic and enter into relationships with and obtain competitive industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services from Hydro Mole, and solicit and induce Mid-Atlantic's employees to terminate their relationships with Mid-Atlantic.

76.    Defendants' misappropriation of Mid-Atlantic Trade Secrets has given Defendants an unfair competitive advantage enabling them to expedite and jump start their new competing business and avoid substantial time and expense they otherwise would have incurred.

77.    By engaging in this and other conduct, Defendants have misappropriated Mid-Atlantic Trade Secrets for purposes of stealing away Mid-Atlantic's business, customers and employees (Counts 1-2).

78.     By engaging in this and other conduct, Defendants have breached and tortiously interfered with the Employment Agreement.  Specifically, Defendants have competed with Mid-Atlantic, solicited Mid-Atlantic's customers and employees, and improperly used and disclosed Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential or proprietary information (Counts 3, 5).

79.     By engaging in this and other conduct, Defendants have breached and aided and abetted the breach of Barfield's fiduciary duties to Mid-Atlantic.  Specifically, Barfield has breached his fiduciary duties of loyalty and confidentiality to Mid-Atlantic and failed to promote, serve and protect the business interests of Mid-Atlantic.  (Counts 4, 6)

80.     By engaging in this and other conduct, Defendants have converted the Vacuum Truck, the computer file, and other Converted Mid-Atlantic Property (Count 7).

81.     By engaging in this and other conduct, Defendants have unjustly enriched themselves at the expense of and to the detriment of Mid-Atlantic (Count 8).

82.     By engaging in this and other conduct, Defendants have defamed Mid-Atlantic (Counts 9).

83.     By engaging in this and other conduct, Defendants have tortiously interfered with Mid-Atlantic's customer relationships (Count 10).

84.     By engaging in this and other conduct, Defendants have conspired together to harm Mid-Atlantic's reputation, trade and business (Counts 11).

85.     Defendants' actions, both individually and collectively, have proximately caused and will continue to proximately cause Mid-Atlantic to suffer immediate and irreparable harm, unless Defendants are preliminarily and permanently enjoined and restrained from: (a) misappropriating Mid-Atlantic Trade Secrets; (b) competing with Mid-Atlantic, soliciting Mid-

18

Atlantic's customers or employees, improperly using or disclosing Mid-Atlantic Trade Secrets or other Mid-Atlantic confidential or proprietary information or otherwise violating the Employment Agreement; (c) interfering with Mid-Atlantic's customer and employee relationships through trade secret misappropriation, bribery, coercion, defamation, deception or other unlawful means or methods; and (d) engaging in any other unlawful actions.

86.    Mid-Atlantic has no adequate remedy at law.  Without preliminary and permanent injunctive relief prohibiting Defendants from continuing to engage in these unlawful actions, Mid-Atlantic may be driven out of business (which is the ultimate intent and purpose of Defendants' conspiracy).

### CAUSES OF ACTION

### Count 1
### Trade Secret Misappropriation
### Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*
### (Against Defendants)

87.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

88.    The Federal Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

89.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the

information derives independent economic value, actual or potential, from not being generally known, to and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

90.     Mid-Atlantic shared with Barfield Mid-Atlantic Trade Secrets relating to its industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services, which included, without limitation, customer lists, files and records, customer quotes, pricing and contracts, customer preferences and requirements, cost, pricing and profit information, pricing strategies for existing, pending and prospective projects, contracts and orders, detailed actual and forecasted financial information, and profit margin information.

91.     Mid-Atlantic Trade Secrets constitute confidential trade secrets, as defined by law, because it is related to services Mid-Atlantic uses in interstate and foreign commerce.   Mid-Atlantic Trade Secrets are the exclusive property of Mid-Atlantic.

92.     Mid-Atlantic Trade Secrets derive substantial, independent economic value from not being generally known to the public or to its competitors, who could obtain economic value from the information.   Mid-Atlantic has expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others.

93.     Mid-Atlantic has taken reasonable steps under the circumstances to safeguard the confidentiality and secrecy of Mid-Atlantic Trade Secrets.   Mid-Atlantic Trade Secrets are only provided to employees on a need-to-know basis subject to password protection and are not provided to anyone outside of the organization without a specific need and appropriate confidentiality and non-disclosure restrictions.

{#2000647-1, 116910-00000-01}

94.     Among other things, Mid-Atlantic has implemented, and its employees have agreed to policies and procedures that prohibit disclosure of Mid-Atlantic Trade Secrets.

95.     To protect these Mid-Atlantic Trade Secrets, Mid-Atlantic also requires its employees, including Barfield, to agree to maintain the confidentiality and refrain from improperly using or disclosing Mid-Atlantic Trade Secrets, pursuant to their employment agreements with Mid-Atlantic.

96.     Barfield agreed to protect, and not to disclose, Mid-Atlantic Trade Secrets.

97.     Mid-Atlantic Trade Secrets are valuable and important to the operation of Mid-Atlantic's business.

98.     Mid-Atlantic Trade Secrets are not known to competitors, and not readily ascertainable through proper means by competitors. Competitors could profit from the use or disclosure thereof.

99.     Defendants have used and misappropriated, and intend to continue to use and misappropriate, Mid-Atlantic Trade Secrets for their benefit without Mid-Atlantic's consent, in breach of Barfield's duty to Mid-Atlantic to maintain their secrecy.

100.     Defendants' conduct constitutes a misappropriation and misuse of Mid-Atlantic Trade Secrets.

101.     If Defendants are permitted to continue to unfairly compete with Mid-Atlantic as described herein, they will continue to use Mid-Atlantic Trade Secrets and to their advantage, and/or to the advantage of competitors and to the irreparable detriment of Mid-Atlantic.

102.     Defendants' actions and conduct were willful and malicious, and in conscious disregard of the rights of Mid-Atlantic.

21

103.    When Mid-Atlantic's Trade Secrets are improperly disseminated to third parties, it can result in monetary damages as well as harm to its business reputation and a loss of goodwill.

104.    By reason of Defendants' violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 and related statutes, Mid-Atlantic faces immediate, substantial, and irreparable harm for which there is no adequate remedy at law.

105.    As a direct and proximate result of Defendants' violations of the DTSA, Mid-Atlantic has sustained and will continue to sustain irreparable injury, the damages from which cannot be easily ascertained and which, in any case, would be inadequate. Accordingly, Mid-Atlantic is entitled to a preliminary and permanent injunction, compensatory and exemplary damages, and attorneys' fees.

106.    As a result of Defendants' foregoing and ongoing acts, Mid-Atlantic has suffered and will continue to suffer immediate and ongoing irreparable injury for which no adequate remedy at law exists.

107.    Mid-Atlantic is entitled to preliminary injunctive relief, pending a trial on this matter, and permanent injunctive relief restraining Defendants and their agents, servants, employees, attorneys, and all others holding by, through or under any of them, or in active concert or participation with any of them, from using, at any time, any Mid-Atlantic Trade Secrets in any fashion, form, or manner for any purpose.

108.    In addition, Defendants and their agents, servants, employees, attorneys, and all others holding by, through or under any of them, or in active concert or participation with any of them, should be required to immediately return and permanently delete or destroy all Mid-Atlantic Trade Secrets, and to certify by a sworn declaration that all such materials and information have been returned, deleted, and destroyed. Defendants also should be required to

provide her computers, phones and other electronic devices to Mid-Atlantic for inspection and forensic analysis so that Mid-Atlantic can confirm that all Mid-Atlantic Trade Secrets and any other Mid-Atlantic property has been deleted.

109.    Defendants' actions entitle Mid-Atlantic to injunctive relief pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*, and other applicable laws and equitable principles prohibiting Defendants from using property belonging to Mid-Atlantic, as described herein.

110.    Unless such injunctive relief is granted, Defendants' ongoing and future conduct will cause Mid-Atlantic irreparable harm for which no adequate remedy at law exists.

<u>**Count 2**</u>
<u>**Trade Secret Misappropriation**</u>
<u>**Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq.***</u>
**(Against Defendants)**

111.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

112.    The Virginia Uniform Trade Secrets Act ("VUTSA") forbids threatened and actual misappropriation of trade secrets. See Va. Code § 59.1-336 *et seq.*

113.    Mid-Atlantic shared with Barfield Mid-Atlantic Trade Secrets, which included, without limitation, customer lists, files and records, customer quotes, pricing and contracts, customer preferences and requirements, cost, pricing and profit information, pricing strategies for existing, pending and prospective projects, contracts and orders, detailed actual and forecasted financial information, and profit margin information.

114.    Mid-Atlantic Trade Secrets constitute confidential trade secrets, as defined by law, and is the exclusive property of Mid-Atlantic.

23

115.    Mid-Atlantic Trade Secrets derive substantial, independent economic value from not being generally known to the public or to its competitors, who could obtain economic value from the information.  Mid-Atlantic has expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others.

116.    Mid-Atlantic has taken reasonable steps under the circumstances to safeguard the confidentiality and secrecy of Mid-Atlantic Trade Secrets.  Mid-Atlantic Trade Secrets are only provided to employees on a need-to-know basis subject to password protection and are not provided to anyone outside of the organization without a specific need and appropriate confidentiality and non-disclosure restrictions.

117.    Among other things, Mid-Atlantic has implemented, and its employees have agreed to policies and procedures that prohibit disclosure of Mid-Atlantic Trade Secrets.

118.    To protect these Mid-Atlantic Trade Secrets, Mid-Atlantic also requires its employees, including Barfield, to agree to maintain the confidentiality and refrain from improperly using or disclosing Mid-Atlantic Trade Secrets, pursuant to their employment agreements with Mid-Atlantic.

119.    Barfield agreed to protect, and not to disclose, Mid-Atlantic Trade Secrets.

120.    Mid-Atlantic Trade Secrets are valuable and important to the operation of Mid-Atlantic's business.

121.    Mid-Atlantic Trade Secrets are not known to competitors, and not readily ascertainable through proper means by competitors. Competitors could profit from the use or disclosure thereof.

{#2000647-1, 116910-00000-01}

122.    Defendants have used and misappropriated, and intend to continue to use and misappropriate, Mid-Atlantic Trade Secrets for their benefit without Mid-Atlantic's consent, in breach of Barfield's duty to Mid-Atlantic to maintain their secrecy.

123.    Defendants' conduct constitutes a misappropriation and misuse of Mid-Atlantic Trade Secrets.

124.    If Defendants are permitted to continue to unfairly compete with Mid-Atlantic as described herein, they will continue to use Mid-Atlantic Trade Secrets and to their advantage, and/or to the advantage of competitors and to the irreparable detriment of Mid-Atlantic.

125.    Defendants' actions and conduct were willful and malicious, and in conscious disregard of the rights of Mid-Atlantic.

126.    When Mid-Atlantic's Trade Secrets are improperly disseminated to third parties, it can result in monetary damages as well as harm to its business reputation and a loss of goodwill.

127.    By reason of Defendants' violations of the Virginia Uniform Trade Secrets Act, Code § 59.1-336, Mid-Atlantic faces immediate, substantial, and irreparable harm for which there is no adequate remedy at law.

128.    As a direct and proximate result of Defendants' violations of the Virginia Uniform Trade Secrets Act, Code § 59.1-336, Mid-Atlantic has sustained and will continue to sustain irreparable injury, the damages from which cannot be easily ascertained and which, in any case, would be inadequate,. Accordingly, Mid-Atlantic is entitled to a preliminary and permanent injunction, compensatory and exemplary damages, and attorneys' fees.

129.    As a result of Defendants' foregoing and ongoing acts, Mid-Atlantic has suffered and will continue to suffer immediate and ongoing irreparable injury for which no adequate remedy at law exists.

25

130.    Mid-Atlantic is entitled to preliminary injunctive relief, pending a trial on this matter, and permanent injunctive relief restraining Defendants and their agents, servants, employees, attorneys, and all others holding by, through or under any of them, or in active concert or participation with any of them, from using, at any time, any Mid-Atlantic Trade Secrets in any fashion, form, or manner for any purpose.

131.    In addition, Defendants and their agents, servants, employees, attorneys, and all others holding by, through or under any of them, or in active concert or participation with any of them, should be required to immediately return and permanently delete or destroy all Mid-Atlantic Trade Secrets, and to certify by a sworn declaration that all such materials and information have been returned, deleted, and destroyed.  Defendants also should be required to provide her computers, phones and other electronic devices to Mid-Atlantic for inspection and forensic analysis so that Mid-Atlantic can confirm that all Mid-Atlantic Trade Secrets and any other Mid-Atlantic property has been deleted.

132.    Defendants' actions entitle Mid-Atlantic to injunctive relief pursuant to the Virginia Uniform Trade Secrets Act, Code § 59.1-336, and other applicable laws and equitable principles prohibiting Defendants from using property belonging to Mid-Atlantic, as described herein.

133.    Unless such injunctive relief is granted, Defendants' ongoing and future conduct will cause Mid-Atlantic irreparable harm for which no adequate remedy at law exists.

<u>**Count 3**</u>
<u>**Breach of Employment Agreement**</u>
**(Against Barfield)**

134.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

135.    The Employment Agreement is a valid, binding and enforceable contract.

26

136.    Mid-Atlantic performed and met its obligations under the Employment Agreement.

137.    Barfield has breached his obligations under the Employment Agreement by, among other things, failing to devote his best efforts and use due diligence in performing duties for and promoting the business of Mid-Atlantic, and failing to act in accordance with and obey all ethical mandates, statutes, rules and regulations in violation of Section 1, misappropriating and improperly using and disclosing Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential or proprietary information and failing to deliver to Mid-Atlantic all Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential and proprietary information in violation of Section 6, competing with Mid-Atlantic in violation of Section 7(a), soliciting Mid-Atlantic customers in violation of Section 7(b), and soliciting Mid-Atlantic employees in violation of Section 7(c).

138.    Barfield's material breaches of the Employment Agreement have proximately caused Mid-Atlantic to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Mid-Atlantic is entitled to recover these damages from Barfield.

139.    Absent preliminary and permanent injunctive relief, Barfield's breaches of the Employment Agreement will continue to cause irreparable injury to Mid-Atlantic and its business.

140.    Mid-Atlantic is entitled to injunctive relief and recovery of its attorneys' fees, costs and expenses from Barfield pursuant to Section 8(a) of his Employment Agreement.

141.    Mid-Atlantic is entitled to have the duration of the covenants and restrictions in Section 6 and 7 of the Employment Agreement extended and tolled during the pendency of any violations, and have these covenants and restrictions run from the date of entry of the injunction order forward pursuant to Section 8(b) of his Employment Agreement.

142.    Unless such injunctive relief is granted, Defendants' ongoing and future conduct will cause Mid-Atlantic irreparable harm for which no adequate remedy at law exists.

**Count 4**
**Breach of Fiduciary Duties**
**(Against Barfield)**

143.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

144.    While employed by Mid-Atlantic, Barfield was entrusted with and allowed access to Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential and proprietary information.

145.    As an employee of Mid-Atlantic, Barfield owed fiduciary duties of loyalty and confidentiality to Mid-Atlantic.  Such duties encompass obligations:  (1) not to use or disclose Mid-Atlantic Trade Secrets or other confidential and proprietary information; (2) not to misappropriate such information to their own or others' purposes; (3) not to divert corporate opportunities from Mid-Atlantic; and (4) not to engage in conduct that caused competitive harm to Mid-Atlantic.

146.    Barfield breached these fiduciary duties by: (1) retaining, disclosing and utilizing Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential and proprietary information for competitive purposes; (2) diverting Mid-Atlantic business and opportunities; (3) working for or on behalf of Hydro Mole, marketing, offering and providing competitive industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services, and soliciting Mid-Atlantic's customers and employees; and (4) otherwise working with

Hydro Mole and Gwinn and engaging in unfair competition with Mid-Atlantic while still employed by Mid-Atlantic.

147. Due to his continuing violations of his fiduciary duties, Barfield should be preliminarily and permanently enjoined and restrained from violating his fiduciary duties.

148. This conduct of Barfield proximately has caused Mid-Atlantic to suffer damages.

149. Mid-Atlantic has suffered and seeks direct and consequential damages as a result of Barfield's breaches of their fiduciary duties to Mid-Atlantic, including, but not limited to, lost profits, compensation for damages to Mid-Atlantic's business reputation and compensation for lost business opportunities, and is entitled to recover these actual damages from Barfield in an amount to be proven at trial.

150. Barfield's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

151. As a result, Mid-Atlantic is entitled to recover punitive damages for Barfield's wrongful conduct.

**Count 5**
**Tortious Interference with the Employment Agreement**
**(Against Gwinn and Hydro Mole)**

152. Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

153. A valid and binding contractual relationship exists between Barfield and Mid-Atlantic in the form of the Employment Agreement.

154. Gwinn and Hydro Mole knew and know that the Employment Agreement existed and exists between Barfield and Mid-Atlantic.

155. Notwithstanding their knowledge of the Employment Agreement, Gwinn and Hydro Mole intentionally, willfully and purposefully interfered with Mid-Atlantic's contractual

29

relationship with Mid-Atlantic by, among other ways, inducing and/or causing Barfield to breach his best efforts and due diligence, non-competition, customer and employee non-solicitation, confidentiality and non-disclosure obligations to Mid-Atlantic under the Employment Agreement.

156.    Gwinn's and Hydro Mole's interference with Mid-Atlantic's contractual relationship with Barfield directly and proximately caused Barfield's breach of his best efforts and due diligence, non-competition, customer and employee non-solicitation, confidentiality and non-disclosure obligations to Mid-Atlantic under the Employment Agreement and the resulting damages and deprivation of benefit to Mid-Atlantic.

157.    Gwinn's and Hydro Mole's tortious interference with the Employment Agreement proximately has caused Mid-Atlantic to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Mid-Atlantic is entitled to recover these damages from Gwinn and Hydro Mole.

158.    Absent preliminary and permanent injunctive relief, Gwinn's and Hydro Mole's tortious interference with the Employment Agreement will continue to cause irreparable injury to Mid-Atlantic and its business.

159.    Gwinn's and Hydro Mole's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

160.    As a result, Mid-Atlantic is entitled to recover punitive damages for Gwinn's and Hydro Mole's wrongful conduct.

### Count 6
### Aiding & Abetting Barfield's Breach of Fiduciary Duties
**(Against Gwinn and Hydro Mole)**

161.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

162.    Gwinn and Hydro Mole had actual knowledge that the actions taken by Barfield were in breach of their fiduciary duties to Mid-Atlantic.

163.    Notwithstanding this actual knowledge, Gwinn and Hydro Mole substantially assisted, encouraged and induced Barfield to breach his fiduciary duties to Mid-Atlantic by: (1) retaining, disclosing and utilizing Mid-Atlantic Trade Secrets and other Mid-Atlantic confidential and proprietary information for competitive purposes; (2) diverting Mid-Atlantic business and opportunities; (3) working for or on behalf of Hydro Mole, marketing, offering and providing competitive industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services, and soliciting Mid-Atlantic's customers and employees; and (4) otherwise working with Hydro Mole and Gwinn and engaging in unfair competition with Mid-Atlantic while still employed by Mid-Atlantic.

164.    Gwinn's and Hydro Mole's aiding and abetting Barfield's breaches of his fiduciary duties to Mid-Atlantic has proximately caused Mid-Atlantic to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Mid-Atlantic is entitled to recover these damages from Gwinn and Hydro Mole.

165.    Absent preliminary and permanent injunctive relief, Gwinn's and Hydro Mole's aiding and abetting Barfield's breaches of his fiduciary duties to Mid-Atlantic will continue to cause irreparable injury to Mid-Atlantic and its business.

166.    Gwinn's and Hydro Mole's actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

31

167.    As a result, Mid-Atlantic is entitled to recover punitive damages for Gwinn's and Hydro Mole's wrongful conduct.

**Count 7**
**Conversion**
**(Against Defendants)**

168.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

169.    Defendants misappropriated and converted from Mid-Atlantic the Vacuum Truck, the computer file and other Converted Mid-Atlantic Property for improper and competitive purposes.

170.    Defendants have no legal right to retain the Converted Mid-Atlantic Property.

171.    Without legal justification, Defendants refuse to return the Converted Mid-Atlantic Property to Mid-Atlantic.

172.    By taking the Converted Mid-Atlantic Property, Defendants have wrongfully exercised authority over the Converted Mid-Atlantic Property.

173.    Mid-Atlantic seeks monetary damages from Defendants.    Mid-Atlantic has suffered and seeks direct and consequential damages as a result of Defendants' conversion, and Mid-Atlantic is entitled to recover these actual damages from Defendants in an amount to be proven at trial.

174.    Defendants' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

175.    As a result, Mid-Atlantic is entitled to recover punitive damages for Defendants' wrongful conduct.

**Count 8**
**Unjust Enrichment**
**(Against Defendants)**

176.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

177.    Defendants' wrongful and opportunistic retention of Mid-Atlantic Trade Secrets and other confidential and proprietary information and property, and misappropriation of Mid-Atlantic business and projects has unjustly enriched Defendants to Mid-Atlantic's detriment and has and will continue to irreparably harm Mid-Atlantic.

178.    Defendants' continued unjust enrichment, if not enjoined, will continue to directly and proximately cause irreparable harm to Mid-Atlantic.

179.    Mid-Atlantic lacks an adequate remedy at law for the harms caused to its business reputation and/or goodwill by Defendants' unjust enrichment.

180.    As a direct and proximate result of Defendants' unjust enrichment, Mid-Atlantic has sustained and will continue to sustain irreparable injury, the damages from which cannot be easily ascertained and which, in any case, would be inadequate.

### Count 9
### Tortious Interference with Customer Relationships
### (Against Defendants)

181.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

182.    Prior to Defendants' interference, Mid-Atlantic had valid contractual relationships with its customers, and Mid-Atlantic legitimately expected to establish new customer relationships with customers.

183.    Defendants were aware of Mid-Atlantic's contractual relationships and of Mid-Atlantic's legitimate business expectation of forming new customer relationships.

33

184. Defendants intentionally, willfully, and purposefully interfered with Mid-Atlantic's relationships with its customers by improper means or methods, including, but not limited to, trade secret misappropriation, bribery, coercion, defamation, deception, breaching and aiding and abetting Barfield's breaches of his fiduciary duties to Mid-Atlantic (by, among other things, using Barfield as a mole within Mid-Atlantic to divert business opportunities from Mid-Atlantic to Hydro Mole, compete with Mid-Atlantic while employed with Mid-Atlantic, solicit Mid-Atlantic customers and employees, and undercut and sabotage Mid-Atlantic's customer contracts and relationships), and misappropriating, using and disclosing Mid-Atlantic Trade Secrets in competition with Mid-Atlantic for purposes of stealing away Mid-Atlantic's customers.

185. As a direct and proximate cause of Defendants' tortious interference, Mid-Atlantic lost customers that Mid-Atlantic reasonably expected to retain or acquire.

186. Defendants' tortious interference with Mid-Atlantic's customer relationships proximately has caused Mid-Atlantic to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Mid-Atlantic is entitled to recover these damages from Defendants.

187. Absent preliminary and permanent injunctive relief, Defendants' tortious interference with Mid-Atlantic's customer relationships will continue to cause irreparable injury to Mid-Atlantic and its business.

188. Defendants' actions were taken willfully and wantonly, maliciously, intentionally, and in bad faith.

189.    As a result, Mid-Atlantic is entitled to recover punitive damages for Defendants' wrongful conduct.

**Count 10**
**Business Conspiracy**
**Va. Code §§ 18.2-499 and -500**
**(Against Defendants)**

190.    Mid-Atlantic repeats and realleges the allegations contained in all the preceding paragraphs of the Complaint, as though fully set forth herein.

191.    Commencing during Barfield's employment with Mid-Atlantic and continuing up to the present, Defendants agreed, combined, conspired and acted in concert together to harm the business of Mid-Atlantic in contravention of Va. Code § 18.2-499 and -500.

192.    Before Barfield's resignation from Mid-Atlantic, Defendants agreed, combined, conspired and acted in concert to harm the business of Mid-Atlantic in contravention of Va. Code § 18.2-499 and -500.

193.    Defendants undertook these actions intentionally, purposefully, willfully and wantonly, maliciously, and without lawful justification.

194.    Defendants' business conspiracy in violation of Va. Code § 18.2-499 and -500 proximately has caused Mid-Atlantic to suffer damages, including, but not limited to, lost profits, loss of goodwill, loss of competitive advantage, loss of business opportunities, damage for business interruption and other damages, and Mid-Atlantic is entitled to recover these damages from Defendants.

195.    Pursuant to Va. Code § 18.2-499 and -500, these damages are subject to trebling and recovery of attorneys' fees.

**WHEREFORE**, Mid-Atlantic respectfully seeks the following:

A.    Mid-Atlantic be awarded a preliminary and permanent injunction against Defendants enjoining and restraining Defendants from engaging in any of the following activities: (1) misappropriating Mid-Atlantic Trade Secrets; (2) breaching or interfering with the Employment Agreement; (3) breaching or aiding and abetting the breach of Barfield's fiduciary duties; (4) interfering with Mid-Atlantic's customer relationships; (5) conspiring against Mid-Atlantic in violation of Va. Code § 18.2-499 and -500; or (6) engaging in any other unlawful actions;

B.    Mid-Atlantic be awarded a preliminary and permanent injunction against Defendants enforcing the Employment Agreement and prohibiting Defendants from working for or on behalf of Hydro Mole, marketing, offering and providing competitive industrial vacuuming and cleaning services, municipality vacuuming and cleaning services, and hydro excavation services, and soliciting Mid-Atlantic's customers and employees;

C.    Mid-Atlantic be awarded compensatory damages against Defendants in the amount of Two Million Dollars ($2,000,000.00);

D.    Mid-Atlantic's recovery against Defendants include, without limitation: forfeiture, recoupment and disgorgement of all profits and gains realized by Defendants from the foregoing wrongful acts, and payment of lost profits to Mid-Atlantic pursuant to Counts 1-2, 4 & 8 or as otherwise provided by law;

E.    Mid-Atlantic be awarded punitive damages against Defendants pursuant to Count 1-2, 4-7 & 9-10, or as otherwise provided by law;

F.    Mid-Atlantic be awarded treble damages against Defendants pursuant to Count 10, or as otherwise provided by law;

36

G.      Mid-Atlantic be awarded recovery of attorneys' fees, costs and expenses pursuant to Counts 1-3 & 10, or as otherwise provided by law;

H.      Mid-Atlantic be awarded interest and costs; and

I.      Mid-Atlantic be awarded such other and further relief as the Court deems proper.


A TRIAL BY JURY IS DEMANDED


Dated:  March 17, 2023                    MID-ATLANTIC FIELD SERVICES, LLC


                                          By: /s Joshua F. P. Long_____
                                                 Of Counsel

Joshua F. P. Long (VSB No. 65684)
J. Benjamin Rottenborn (VSB No. 84796)
WOODS ROGERS VANDEVENTER BLACK PLC
Wells Fargo Tower, Suite 1800
10 South Jefferson Street
Post Office Box 14125
Roanoke, Virginia 24038-4125
Telephone No. (540) 983-7600
Facsimile No. (540) 983-7711
Josh.long@wrvblaw.com
Ben.rottenborn@wrvblaw.com

        Counsel for Plaintiff Mid-Atlantic Services, LLC